IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ADELINE L. TURNER,               )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     CIVIL ACTION NO. 2:10cv016-SRW
                                 )
MICHAEL ASTRUE,                  )
Commissioner of Social Security, )
                                 )
          Defendant.             )

## MEMORANDUM OPINION

Plaintiff Adeline L. Turner brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her applications for a period of disability and disability insurance

benefits and for supplemental security income under the Social Security Act.  The parties

have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C.

§ 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes

that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

### Plaintiff's Applications

Plaintiff was born on April 20, 1960. On July 31, 2007, plaintiff protectively filed

applications for benefits under Title II and Title XVI, alleging disability since December 31,

2005, due to knee pain, lower back pain, poor vision in her right eye, hand pain, headache,

and heart murmur. (R. 60-61, R. 108-120).  Plaintiff claimed that her condition limits her

ability to work because she cannot sit for long and she has pain.  (R. 132).  In a physical activities questionnaire completed on September 12, 2007, plaintiff stated that she requires help getting out of bed, bathing, and getting dressed. She gets out of breath trying to dress herself, and her arms won't reach over her head due to pain. Her fingers cramp up and her neck stiffens up.  She sits much of the time.  She walks only when needed and stands only when needed.  (R. 139).  She stated that she uses a walker because her balance is not good and her family does all of the grocery shopping because she cannot walk around the store. (R. 140, 143).  She indicated that she requires assistance with all activities including bathing, walking, hygiene, fixing her hair, brushing her teeth, applying lotion, putting her shoes on and off, and dressing and undressing. (R. 143).

On September 12, 2007, plaintiff also completed a pain questionnaire.  She stated that she does not recall when her pain started but that it got worse after her surgery in 2003. It is located in her neck, legs, knees, hands, shoulders and lower back. Her pain lasts all day, every day, and pain medication gives her some relief.  She takes Lortab 7.5 every four hours.  (R. 145).  The medication relieves her pain for about thirty minutes at a time and causes sleepiness.  She stated that, to relieve the pain, she lies still throughout the day and night. (R. 146). Plaintiff also completed a cardiovascular questionnaire on September 12, 2007.  She stated that she rides a stationary bike since having knee problems, and that she was told do so by Dr. Fletcher.  She does hand squeezes and sit-ups daily. It takes plaintiff three hours – from about 6:00 a.m. until 9:00 a.m. – to walk around the outside of her house.  She has heart

palpitations and, at times, has to stop to catch her breath.  She reported discomfort since 2000 in her heart, arms, fingers, and legs.  The discomfort starts at her head and moves to her legs, feeling like pain initially and then turning to "tingles."  It lasts until she stops and rests and takes a pain pill.  She has to lie down about every three hours.  She has shortness of breath with any activity when she moves.  (R. 147-48).

## Medical Records

On March 11, 2005, plaintiff sought treatment at the emergency room, stating that she had pulled a muscle in her stomach while lifting a box of water.  (R. 188).  She reported sharp moderate pain that persisted for a couple of hours.  (R. 189).  The physician diagnosed myofacial injury of the abdomen.  (R. 190).  The emergency room work excuse indicated that plaintiff would need to be off from work for an estimated period of two days.  (R. 193).

The following month, on April 6, 2005, Dr. Victoria Beckman referred plaintiff to Baptist South for her complaints of left knee pain and swelling.  Dr. Beckman requested an MRI of plaintiff's left knee.  (R. 183).  Dr. Mary Karst read the MRI and reported impressions of: (1) "complex tear of the lateral meniscus with evidence of bucket handle tear with medial displaced fragment.  Degenerative changes in the lateral compartment with loss of articular cartilage and subchondral cyst formation as well as subcondral sclerosis. Minimal degenerative change in the medial compartment[,]" and (2) "probable chronic tear of the lateral collateral ligament." (R. 185-186; 228-29).

On June 28, 2005, Dr. Charles Fletcher, an orthopedic surgeon, evaluated the plaintiff.

3

(R. 226).  After reviewing plaintiff's x-ray and her MRI, Dr. Fletcher recommended that plaintiff have arthroscopic surgery of her left knee.  He advised her to get a bicycle and start riding it every day. He further advised her to get on a diet and lose some weight.  (R. 226). Dr. Fletcher performed the surgery – "comprehensive arthroscopy and debridement of osteochondral defect with chondroplasty lateral compartment and removal of loose body left knee" – one month later, on July 29, 2005. (R. 227).  Plaintiff returned to Dr. Fletcher for a follow-up appointment on August 8, 2005.  Dr. Fletcher noted that plaintiff was doing well with her exercises and advised her to build up to twenty minutes on her stationary bike three times a day.  (R. 225). On a follow-up appointment on September 16, 2005, Dr. Fletcher wrote, "She's done real well with her knee scope.  I want her to work hard on her bike every[ ]day.  No swelling today. Her knee is real quiet.  She says it feels good.  I'll see her back and check her in the future if she has a problem.  (Id.).

On June 18, 2007, nearly two years after her surgery, plaintiff reported to Lister Hill Clinic for a physical examination.  She stated that she had been out of her medications for one year.  (R. 265-66).  Her physical examination was normal, including examination of her "Extremities/Back."  (R. 266).  The doctor noted that plaintiff had uncontrolled hypertension due to noncompliance.  He prescribed a low sodium diet and medication.  (Id.).  Plaintiff's blood test revealed a high cholesterol level.  (R. 271).  The following week, plaintiff returned to Lister Hill complaining of swelling in her right knee. The clinic physician prescribed Lortab.  (R. 265).

On July 2, 2007, plaintiff returned to Lister Hill Clinic.  She complained of right and left knee pain and swelling, and back pain.  (R. 263).  She reported that she was on Lortab for her knees and lower back and that she was diagnosed with rheumatoid arthritis in 2001.  The doctor refilled her prescriptions, including her prescription for Lortab.  (R. 263).  The clinic called in prescriptions for Lortab on July 12, 2007.  Two weeks later, plaintiff filed the present applications for disability benefits, alleging disability since December 31, 2005. (R. 108-120).

Lister Hill Clinic called in another Lortab prescription on August 10, 2007. (R. 260-62).  On August 14th, plaintiff went to the Jackson Hospital emergency room complaining of back pain.  (R. 241-245).  She reported an acute onset of back pain with pain radiating down into both of her legs. She stated that she had no chronic back pain and no previous back injury. (R. 241).  Her ambulation was observed to be normal.  (R. 242).  Plaintiff reported that the problem started twelve hours previously when she lifted a case of water and twisted.  (R. 242).  On physical examination, the doctor noted that she appeared to be  comfortable, with no extremity tenderness.  (R. 243).  Plaintiff's lumbar spine x-ray showed mild disc space loss at L4-5 and L5-S1 with no fracture or spondylolisthesis.  (R. 245). The emergency room physician discharged plaintiff with a prescription for Lortab and also for Flexeril and advised her to follow-up with her primary care doctor in three to five days or immediately if her symptoms got worse.  (R. 244).  Lister Hill called in additional Lortab prescriptions for the plaintiff on August 20, 2007, September 21, 2007 and October 3, 2007.  (R. 260).

On October 24, 2007, plaintiff reported for a consultative physical examination by Dr.

James O. Colley. (R. 207-214). Dr. Colley noted plaintiff to be moderately obese. Plaintiff complained of knee pain, foot pain, shortness of breath, headaches and limited vision. She stated that the arthroscopic surgery by Dr. Fletcher in 2003 helped for about three months. She reported that both of her knees swell, buckle, pop and grind and that the pain level in both knees was at a level of eight on a scale of ten. Plaintiff told Dr. Colley that most of her pain was on the inside of her knees, and that it radiated up to her low back area then up to the right side of her dorsolumbar spine to her neck, and from her neck down both arms to her hands. She reported tingling in all ten fingertips, and stated that both feet swell and itch on the bottom. Plaintiff stated that she had bilateral foot pain that had been present for about a month. (R. 207-08). Plaintiff also complained of nocturnal chest pain, heart flutter, palpitations, shortness of breath, and dyspnea on exertion. Plaintiff told Dr. Colley that she was diagnosed with hypertension when she was eighteen years old and that, at the time of the consultative examination, she was out of all of her medications. She reported throbbing right parietal headaches. (R. 208). Plaintiff stated that she was a welder at one time and probably injured her eye then. She reported blurred vision in her right eye for the previous three months. Plaintiff told Dr. Colley that she can walk only half a block due to her knee pain, that she can sit for thirty minutes due to her knees getting stiff, that she can stand for fifteen minutes and can ascend about three steps using a handrail. (R. 208).

Dr. Colley observed that plaintiff appeared to be fairly comfortable and in no acute distress and that she did not appear to have a pain level of 8/10. (R. 210). He further noted

plaintiff's normal gait, but stated that she was "somewhat slow standing up from a sitting position and getting on the examination table due to stiffness in her knees." (R. 210). Plaintiff was 5 feet 1 ½ inches tall and weighed 162 pounds; her blood pressure was recorded at 160/120. (R. 210). On examination, Dr. Colley noted a Grade 1/6 systolic murmur. (R. 211). He noted plaintiff's normal station, gait, and coordination.  Her Rhomberg was negative, and she was able to squat to forty percent and get back up without assistance and tandem walk fairly well, but she was unable to walk on her heels and toes due to foot pain. (R. 211).  Her straight leg raising test was negative, both sitting and supine. (R. 212).  Dr. Colley noted that plaintiff had moderate valgus deformities bilaterally in her knees. (R. 212-213).  She had mild pain on passive range of motion of her right knee, without crepitus.  Examination of her left knee revealed mild pain with full passive range of motion, with mild crepitus.  She appeared to have severe pain with hyperflexion of her left knee.  Dr. Colley further noted a moderate effusion above the left knee and above the lateral femoral epicondyle. Plaintiff had mild medial joint line tenderness on the right knee, and on the left she had tenderness over both the medial and lateral joint lines with maximum tenderness, according to the plaintiff, over the medial joint line.  Plaintiff had severe pain with valgus and varus stressing over the lateral surface of the knee, especially over the lateral femoral epicondyle.  Examination of plaintiff's dorsolumbar and cervical spine revealed no paravertebral muscle spasms or trigger point tenderness. (R. 213). Plaintiff had 5+/5 strength in her lower extremities, including dorsiflexion/plantar flexion of the ankles and extensor hallucis longus bilaterally.  She had

7

normal muscle bulk and tone except in the left quadriceps muscle, where she had only fair muscle tone. There was no muscle atrophy.  (R. 213).  Dr. Colley diagnosed moderate to severe degenerative joint disease of the left knee, with a chronic lateral collateral ligament tear, and mild degenerative joint disease of the right knee.  He further diagnosed mild to moderate genu valgus deformities of the knee, a history of bilateral foot pain with normal examination, poorly controlled hypertension secondary to non-compliance, probable asymptomatic heart murmur, atypical chest pain, hypertensive headaches and "probable malingering except for her degenerative joint disease of the left knee and hypertensive headaches."  (R. 214).

The week after the consultative examination, on November 2, 2007, Lister Hill called in another Lortab prescription.  (R. 260-62).  On November 15, 2007, plaintiff returned to Lister Hill for evaluation.  She complained of bilateral knee pain at a level of eight on a scale of ten.  (R. 259). She stated that only Lortab helps with her pain. The doctor diagnosed bilateral knee pain and hypertension.  (R. 258). Two months later, on January 9, 2008, plaintiff called the clinic requesting more Lortab.  The doctor stated that she needed to come in for evaluation to get a refill for this medication.  However, on February 4, 2008, the clinic called in another Lortab prescription.  (R. 257).

On February 14, 2008, plaintiff returned to the clinic, reporting that her knees were still hurting and that she had some swelling.  The doctor noted no signs of inflammation but did note some tenderness, and diagnosed bilateral knee pain and hypertension. (R. 255).  A week

later, on February 21, 2008, the Lister Hill physician prescribed Ultram and discontinued plaintiff's prescription for Lortab.  On March 5, 2008, plaintiff's medication was changed to Darvocet. (R. 254).  A note in the record dated March 18, 2008 states, "[Patient] has been told will not get any more Lortab refills rm. prev. visit[.]" (R. 254).

On April 10, 2008, plaintiff went to the Jackson Hospital emergency department after a motor vehicle accident. She denied neck or back pain. (R. 232).  Her extremities were noted to be non-tender, with normal strength, a no obvious injuries were noted. (R. 233).  Plaintiff complained of pain to the right side of her head, across her shoulders and upper chest, and also in her lower abdomen.  She stated she was wearing her seatbelt and her vehicle struck a tree. (R. 233).  She also complained of left lateral neck pain. (R. 233).  On physical examination, plaintiff had no tenderness and full range of motion in all extremities.  Her neck exam revealed soft tissue tenderness, with moderate muscle spasm of the posterior neck muscles. (R. 234).  Plaintiff's cervical spine x-ray was negative. (R. 238).  The doctor noted no evidence of cervical fracture, normal disc space and no significant soft tissue changes.  (R. 235).  Plaintiff was diagnosed with cervical strain and MVA collision.  (R. 234). The ER physician prescribed Ibuprofen and Lortab.  (R. 235).

A week later, plaintiff returned to Lister Hill.  She reported the motor vehicle accident of the previous week and said that she was still having some neck and jaw pain, at a level of eight on a scale of ten. The physician diagnosed "MVA" and hypertension, and prescribed medication including Lortab. (R. 251).  Eleven days later, Lister Hill clinic called in another

9

prescription for Lortab.  On May 8, 2008, plaintiff called the clinic requesting more Lortab, but the physician refused to prescribe it without further evaluation.  (R. 250).  The following week, on May 15, 2008, plaintiff returned to Lister Hill.  She stated that she was still having spasms in her neck and shoulders since the motor vehicle accident. The doctor diagnosed hypertension and neck/muscle strain.  He prescribed medication,l including Lortab.  (R. 249).  On May 23rd, June 10th and July 18th, the clinic called in additional prescriptions for Lortab. (R. 248, 275).

On August 1, 2008, plaintiff called in requesting another prescription for Lortab.  The doctor discontinued the Lortab and made a note in the record to send a letter advising plaintiff to return to the clinic ASAP. (R. 275).  Three days later, the clinic called in another prescription for Lortab. (R. 275). Plaintiff returned to the clinic on August 7, 2008, complaining of pain in her knees and lower back. She reported that she was continuing to have problems with her knees since she had surgery on both knees in 2002, and that she had been told that she may need a knee replacement.  She told the doctor that she is only able to "do something" if she is on Lortab. The physician diagnosed bilateral osteoarthritis of the knees and hypertension.  (R. 276).  An x-ray of plaintiff's right knee performed at that time revealed degenerative changes in the medial compartment of her leg but "[n]othing acute." (R. 280).

**Administrative Hearing and ALJ's Decision**

The ALJ conducted an administrative hearing on August 21, 2008. (R. 27-59). Plaintiff testified that her uncontrolled blood pressure and torn cartilage in her knee are her main problems. She also testified that she has rheumatoid arthritis in both knees, is in constant pain and takes Lortab 7.5 twice a day. (R. 33-34). She takes other over-the-counter pain medication twice a day and more often than twice on some days. (R. 35). She testified that in addition to the pain in her knees she has pain in her neck, lower back, fingers and left shoulder. (R. 36). She stated that she has an enlarged heart and that her vision is blurred, especially when she first gets up in the morning. She has not had any recent eye examination and does not have glasses. (R. 37). Plaintiff testified that she can lift and carry about five pounds, that her daughters do her grocery shopping and cooking, and that she does only minimal housework. (R. 37-38). Plaintiff stated that she cannot do any of her previous jobs because of the constant pain that she has in her knees, her neck, and her fingers; numbness in her fingers; and a need to stand up after sitting and then sit back down. (R. 38-39). She testified she had knee surgeries on both knees in 2002, that her left knee is now as it was before the surgery and bothers her more than the right knee. (R. 39-40). Plaintiff testified that she no longer drives due to pain and, also, because of drowsiness caused by her medication. (R. 42). She testified that, on bad days, she has to stay in bed, and that she seldom has two good days in a row. (R. 43). Her motor vehicle accident in 2008 made her neck and her lower back worse. (R. 45-46). When she is seated, she keeps her legs elevated. After a while, her feet start going to sleep so she walks to the next room or the kitchen and then

11

comes back and sits again.  She can sit thirty minutes at a time "at least."  (R. 46).  She cannot

sit for long because the lower part of her back starts tingling.  She stated that her medication

affects her vision.  (R. 47).

Dr. James N. Anderson testified as a medical expert.  (R. 48).  He testified, based on

his review of the medical records, that plaintiff's condition would not meet or equal a listing.

He stated that, from an orthopaedic standpoint, plaintiff should be limited to light work

activities.  (R. 49).  The ALJ also took testimony from a vocational expert.  (R. 51-56).

The ALJ issued a decision on October 28, 2008.  He concluded that plaintiff meets the

insured status requirements of the Social Security Act through December 31, 2010 and that

she has not engaged in substantial gainful activity since December 31, 2005, her alleged onset

date.  He found that she has severe impairments of degenerative joint disease in both knees

and mild to moderate genu valgus deformities in her knees.  (R. 15).  The ALJ determined that

the claimant does not have an impairment or combination of impairments that meet or

medically equal a listing.  (R. 24).  The ALJ concluded that:

> [T]he claimant has the residual functional capacity to perform light work
> activity, with a sit/stand option, with the following limitations/considerations:
> The claimant's visual acuity is 20/20 on the left and 20/30 on the right.  The
> claimant can sit 6 hours without interruption 1-2 hours.  The claimant can stand
> for 2 to 6 hours without interruption 30 minutes.  The claimant can walk 4 to 6
> hours without interruption 30 minutes.  The claimant can lift, carry, push and
> pull frequently up to 10 pounds over and occasionally up to 20 pounds.  The
> claimant can use her hands for simple grasping and for fine manipulations.  The
> claimant can occasionally use both feet for repetitive movements such as
> operating foot controls and pushing and/or pulling.  The claimant can
> occasionally bend, stoop, crawl, climb, and crouch.  The claimant should avoid
> climbing ladders, ropes and scaffolds.  The claimant should avoid kneeling and

balancing. The claimant should avoid using her left arm for reaching above shoulder level. The claimant should avoid activities involving unprotected heights. The claimant should avoid being around moving and hazardous machinery and driving commercial motorized vehicles. The claimant experiences mild to moderate pain which occasionally affects her ability to maintain concentration, persistence and pace.

(R. 24). The ALJ found that plaintiff is capable of performing her past relevant work as a dispatcher, as it is generally performed, and her past relevant work as a companion and nursing assistant, as it was actually performed. (R. 25). Accordingly, the ALJ concluded that the plaintiff has not been under a disability as defined in the Social Security Act from December 31, 2005, through the date of the decision. (R. 25).[1] The ALJ issued his decision on October 28, 2008. (R. 26). On November 5, 2009, the Appeals Council denied plaintiff's request for review. (R. 1-3).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

---

[1] As plaintiff argues (Doc. # 12, p. 2 n. 1), the ALJ stated incorrectly that he received no additional records after the administrative hearing. See R. 24. At the August 21, 2008, hearing, plaintiff's attorney noted that the record included no medical records for treatment after July 2008. Plaintiff stated that she had seen Dr. Mulles two weeks before the hearing, and the ALJ kept the record open to allow plaintiff to submit the additional treatment records. (R. 57-58). Exhibit 8F includes a treatment note from Dr. Mulles for the August 7, 2008, office visit about which plaintiff had testified, and Exhibit 9F includes that same treatment note, along with results for a right knee x-ray (showing degenerative changes but "nothing acute") and other laboratory testing performed on that visit; it further includes some September 2008 notes about prescription call-ins and sending records to plaintiff's attorney. (R. 273-80). The ALJ summarized these additional exhibits in his opinion (R. 23). His statement that "[n]o additional treatment records were received" (R. 24) is – while incorrect – harmless.

Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. <u>Davis v. Shalala</u>, 985 F.2d 528, 531 (11th Cir. 1993); <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Cornelius</u>, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. <u>Davis</u>, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. <u>Cornelius</u>, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff contends that the ALJ's residual functional capacity finding is not based on substantial evidence. Plaintiff maintains first that the ALJ begins his discussion of the evidence with plaintiff's visit to Dr. Fletcher's office for a recheck on September 16, 2005, after her arthroscopic surgery. Plaintiff notes that the ALJ did not discuss her visit to the Baptist Health Center on March 11, 2005, with complaints of left knee pain and swelling, her MRI on April 6, 2005, her initial visit to Dr. Fletcher on June 23, 2005 or the actual surgery on July 29, 2005. (Doc. # 12, pp. 5-7). However, it is clear that the ALJ was aware of plaintiff's previous knee surgery. At the administrative hearing before the ALJ, the plaintiff

14

testified about having had surgery on both knees. (R. 33).  On questioning from her attorney, plaintiff testified to having knee surgeries on both knees in 2002 and again on her left knee in 2005. (R. 39-40).  The ME testified about the surgery in response to a question from the ALJ and, also, in response to further questioning by plaintiff's counsel. (R. 49-50).  The ALJ mentioned the surgery in his decision, noting plaintiff's testimony that she has had arthroscopic procedures done on both knees, and also noting Dr. Fletcher's indication in his September 16, 2005, treatment note that plaintiff had "done real well with her knee scope." (R. 16).

Plaintiff next points to her diagnosis on October 24, 2007, by Dr. Colley, the consultative examiner, of "moderate to severe degenerative joint disease of the left knee with a chronic lateral collateral ligament tear."  She argues that "the reasonable inference is that this impairment has continued since it was first diagnosed two years earlier by clinical and objective findings, unaddressed by the August 2005 surgery." (Doc. # 12, p. 7)(citing R. 214). The ALJ concluded that plaintiff has degenerative joint disease bilaterally in her knees and mild to moderate genu valgus deformities of the knees. (R. 15).  Thus, it appears that plaintiff's complaint is with the ALJ's failure to find that she suffers, in addition, from a lateral collateral ligament tear. However, at the time of the consultative examination, Dr. Colley had before him the MRI from April 6, 2005, plaintiff's disability report, and part of an emergency room report.  He did not have medical evidence regarding the surgery that was performed on the plaintiff in 2005, after the MRI. (R. 207). In her disability report, the

plaintiff did not reference the surgery. (R. 131-138). In giving her medical history to Dr. Colley, plaintiff told him about the arthroscopic surgery on both of her knees in 2003 but did not, apparently, mention the 2005 surgery. (See R. 207-08, noting under "history of Present Illness" that plaintiff "is status post arthroscopic surgery on both knees in 2003 by Dr. Fletcher" and R. 209, under "Past Surgical History," listing only hysterectomy and "[a]rthroscopic surgery on both knees in 2003."). During the hearing before the ALJ, plaintiff's attorney asked the medical expert about the MRI finding of a probable chronic tear of the lateral collateral ligament and whether the post-MRI surgery had "fixed it or not." The medical expert responded that the arthroscopic surgery included repairing the lateral and medial ligaments. (R. 50). The ALJ was entitled to rely on the testimony of the medical expert and, accordingly, his failure to include a lateral collateral ligament tear among plaintiff's "severe" impairments is supported by substantial evidence.

Plaintiff further contends that the medical expert's testimony that plaintiff could perform light work with a sit/stand option [2] is "too broad" to provide substantial support for the ALJ's residual functional capacity finding. (Doc. # 12, pp. 8-10). The court disagrees. The medical expert's testimony may be understood to mean that plaintiff is able to perform a full range of light work exertionally, as defined in the Commissioner's regulations,[3] with no

---

[2] The court reporter transcribed the ME's hearing testimony as "six ten possibly even" rather than "sit/stand option." However, plaintiff does not dispute the ALJ's statement that the ME testified that plaintiff can perform light work with a sit/stand option. (See R. 49; Doc. # 12, p. 9).

[3] See 20 C.F.R. § 404.1567(b); § 416.967(b).

additional limitation other than the requirement for a sit/stand option.  The ALJ bears the responsibility for assessing residual functional capacity (see 20 C.F.R. § 404.1560(c)).  The RFC determined by the ALJ in this case is more restrictive than that testified to by the medical expert.  Contrary to plaintiff's argument, the ME's testimony provides substantial evidence to support the ALJ's RFC finding.[4]

Plaintiff also points out that the ALJ's hypothetical question to the vocational expert at the hearing did not include the limitation expressed in the ALJ's RFC that "[t]he claimant experiences mild to moderate pain which occasionally affects her ability to maintain concentration, persistence and pace."  (Doc. # 12, pp. 11-12).  Plaintiff is correct.  The ALJ did not include a concentration limitation in his hypothetical question to the VE and did not ask the VE whether an occasional inability to maintain concentration, persistence or pace – caused by mild to moderate pain – would preclude the jobs identified by the VE.  (R. 51-55). However, after the VE testified that pain at a "moderately severe grade level on a chronic and sustained basis would prevent work" (R. 55), plaintiff's attorney asked the VE about concentration deficiencies caused by drowsiness, rather than pain.  (R. 55-57).  The VE testified as follows:

Q.  I know you said that if her testimony was credible there would be no jobs,

---

[4] Plaintiff argues that SSR 96-8p "necessitates a function by function analysis" and that SSR 83-12 "requires the amount of time that an individual can sit and stand in an [8-]hour day to be specified."  (Doc. # 12, p. 9).  However, SSR 83-12 pertains entirely to application of "the grids" to support a step-five finding of "other work" and is inapplicable in this case. SSR 96-8p pertains to the ALJ's analysis of a claimant's RFC and does not, as plaintiff suggests, require that an ALJ obtain a function-by-function assessment from a medical expert before making an RFC determination.

but I just have one – a, a different, specific thing out of her testimony other than the pain that I was going to use in this hypothetical.  But if a person could not – had a drowsiness that, I guess, it's supposed to be two hours you're supposed to concentrate at a, at a time without – if the, if the drowsiness was so bad that the – or sleepiness that the person couldn't concentrate on a job for two hours at a time, would that – I guess, if found credible preclude work?

A.  Well there are all of kind of levels of concentration –

Q.  Well if it –

A.  – and attention to –

Q.  Okay.

A.  – tasks and, I guess, depending on if, if one was, you know, falling asleep –

Q.  Like – right.

A.  – those conditions, *but if it was a, a situation where you were – had a temporary lapse of concentration that would not be a significant factor in most jobs unless you were operating a piece of machinery or something, but not typically in the kinds of jobs that I've addressed here*.

(R. 55-56)(emphasis added).

As noted above, the ALJ determined that plaintiff "experiences mild to moderate pain which occasionally affects her ability to maintain concentration, persistence and pace." (R. 24).  Plaintiff's counsel, in the testimony set forth above, was questioning the VE about concentration lapses caused by drowsiness rather than by pain.  However, the functional limitation – concentration deficiencies – is the pertinent issue, rather than the underlying cause of the functional limitation, in assessing plaintiff's ability to perform the work functions of a particular job. The VE's testimony that temporary lapses in concentration would not

typically be a significant factor in the jobs he had addressed is sufficient – albeit minimally so – to provide substantial evidentiary support for the ALJ's conclusion that the identified jobs are not precluded by plaintiff's occasional deficiencies in concentration, persistence and pace.

Plaintiff represents that she suffers from knee pain "assessed as moderately severe by SSA's own consultative physician[.]" (Doc. # 12, p. 12).  She argues that the ALJ erred by rejecting Dr. Colley's opinion "reflected in a diagnosis of moderately severe pain [.]" (Id., p. 13).  Plaintiff misstates Dr. Colley's report.  Dr. Colley did not diagnose or assess moderately severe *pain*, as plaintiff argues.  Instead, he diagnosed "[m]oderate to severe degenerative joint disease of the left knee [,]" and "mild degenerative joint disease of the right knee."  (R. 214). Dr. Colley observed that plaintiff "appeared fairly comfortable and in no acute distress," that she "did not appear to have a pain level of 8/10," and that her gait was normal.  (R. 210). On examination of plaintiff's knees, he noted that she had mild pain on passive range of motion as to both knees. With regard to her left knee, Dr. Colley stated that plaintiff "appeared to have severe pain *with hyperflexion*" and that she "had severe pain *with valgus and varus stressing over the lateral surface of the knee*[.]" (R. 213)(emphasis added).  In her opening statement to the ALJ, plaintiff's counsel pointed to these observations in Dr. Colley's report, arguing – correctly – that with some of her movements she had mild pain but, with "a couple of them that she had some severe pain when [Dr. Colley] was trying to do various things with her knee[.]" (R. 29-30).  However, Dr. Colley did not – as plaintiff now contends – diagnose "moderately severe pain."  Since Dr. Colley made no such diagnosis, the ALJ did


not err in rejecting it.

The ALJ concluded at the final step of his analysis that plaintiff can perform her past relevant work as a dispatcher, as it is generally performed, and that plaintiff can perform her past work as a companion and as a nursing assistant as she actually performed that work. Plaintiff directs her argument in this court to the finding regarding her nursing assistant job, and does not address the ALJ's finding regarding the dispatcher work.[5]  (See Doc. # 12, p. 2 (noting the ALJ's finding that she can "return to her past work including nursing assistant (R. 25)" and omitting the finding regarding dispatcher); id. at p. 10 (arguing that "while some of the past work might allow for the sitting and standing tolerances outlined by the ALJ" there is nothing to indicate that "the work of a nursing assistant would allow for sitting and standing at will").  The court agrees that the ALJ's step four finding that plaintiff's past work as a nursing assistant and as a companion – as she actually performed that work – is not supported by substantial evidence.

Plaintiff's description of the requirements of her past work as a companion and as an aide at J.S. Tarwater[6] indicated that she would sit, walk and stand "when needed."  (See Work History Report, R. 153-54).  While this description demonstrates that plaintiff did some of all three activities during the work day, it does not suggest that she did so at her option.  In her

---

[5] At the administrative hearing, the vocational expert testified about plaintiff's previous work as a "switchboard operator" and also referred to this job using the title of dispatcher.  It is clear from the testimony, however, that both job titles refer to the same past work.  (R. 51-53).

[6] Plaintiff listed her job as "CTS." The vocational expert testified that it was "a nursing assistant type job."

application, plaintiff provided a more precise description of her job as a companion/CNA for a resident at the assisted living facility, stating that she would walk, stand, and sit for three hours each in the job.  (R. 132-33).  However, she also stated that she would kneel for one hour (R. 133), a job function that the ALJ found that plaintiff "should avoid" (R. 24).[7] Additionally, as with the description in her work history report, plaintiff's summary in the application does not speak to the issue of whether she could sit or stand at her option.  In her description of the "home health aide" job, plaintiff indicated that she had to stand for "6 ½" hours (R. 150), a job requirement precluded by the ALJ's determination that plaintiff is able to stand for "4 to 6 hours" (R. 24).

At the hearing, the ALJ did not elicit clarifying testimony from the plaintiff regarding the specific requirements of her past jobs as she actually performed them. He heard no testimony from the plaintiff regarding whether those jobs – again, as she actually performed them – permitted a sit/stand option. The vocational expert testified that plaintiff could perform her past work as a companion and as a nursing assistant as she actually performed them. However, since there is nothing in the record to indicate that any of plaintiff's past jobs permitted a sit/stand option, that she did not actually have to kneel for an hour each day in her work as a companion/CNA as she had indicated, or that she did not actually have to stand for 6 ½ hours in her job as a home health aide, the VE's testimony does not provide substantial evidentiary support for the ALJ's conclusion as to these jobs.

_____

[7] See also R. 53 (including limitation of "no kneeling" in the hypothetical question to the vocational expert).

However, the ALJ also found that plaintiff can perform her past relevant work as a dispatcher, as that work is generally performed.  (R. 25).  The vocational expert testified in response to the ALJ's hypothetical question that plaintiff could perform the requirements of her past work as a dispatcher. He did not – as he did with respect to the nursing assistant and companion work – qualify the response by limiting it to the job as plaintiff actually performed it.  (R. 53). Thus, the ALJ's finding that plaintiff could perform the dispatcher work as it is performed generally is supported by the vocational expert's testimony.[8]

## CONCLUSION

The issues raised by the plaintiff in this appeal do not warrant reversal of the Commissioner's decision.  For the foregoing reasons, and upon review of the record as a whole, the court concludes that the decision of the Commissioner does not contain reversible legal error and is supported by substantial evidence. Accordingly, the decision is due to be AFFIRMED.  A separate judgment will be entered.

DONE, this 6th day of June, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[8]  The ALJ concluded his analysis at step four and did not make an alternative step five finding that plaintiff can perform other work.  (R. 25).  However, such a finding would have been supported by the VE's testimony as to other jobs plaintiff can perform.  (See R. 53-54).